IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 11, 2015

## WILLIAM KEITH BLACKBURN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Lawrence County**
**No. 26007     Robert L. Jones, Judge**

_____

**No. M2014-00950-CCA-R3-PC - Filed May 19, 2015**

_____

Petitioner, William Keith Blackburn, appeals from the post-conviction court's denial of his petition for post-conviction relief. Petitioner was convicted of first degree premeditated murder and especially aggravated robbery. He received an effective life sentence. Petitioner challenged his convictions on appeal, and a panel of this court affirmed the judgments of the trial court. *State v. William Keith Blackburn*, No. M2009-01140-CCA-R3-CD, 2011 WL 2893083 (Tenn. Crim. App. July 20, 2011), *perm. app. denied* (Tenn. Oct. 19, 2011). On appeal, Petitioner contends that his trial counsel was ineffective for failing to call John Haggard, Adrian Rich, and Brent Olive as witnesses at trial. After a careful review of the record, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the Court, in which ROBERT L. HOLLOWAY, JR. and TIMOTHY L. EASTER, JJ., joined.

Stanley K. Pierchonski, Pulaski, Tennessee, for the appellant, William Keith Blackburn.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; and Mike Bottoms, District Attorney General, for the appellee, the State of Tennessee.

**OPINION**

*Trial*

A summary of the facts underlying Petitioner's convictions can be found in this court's opinion in *State v. William Keith Blackburn*, No. M2009-01140-CCA-R3-CD, 2011

WL 2893083 (Tenn. Crim. App. July 20, 2011), *perm. app. denied* (Tenn. Oct. 19, 2011). In that opinion, this court gave the following facts:

The proof at trial revealed that on June 9, 2006, the victim and his son, Heath, planned to drive from Waynesboro to Spring Hill to pick up the victim's youngest son, Cody, who was living at the Tennessee Children's Home. Before leaving Waynesboro, the victim and Heath drove to the bank, the victim withdrew fifty dollars from his account, and the victim placed the money in his wallet. At trial, Heath testified that his father also had some old two-dollar bills, old coins, his driver's license, a social security card, a TennCare card, and his food stamp card with him.

The two men left Waynesboro on Highway 64, traveling toward Lawrenceburg. Heath testified that he rode with the victim because the victim did not like to travel alone. Shortly after entering Lawrence County, a rear tire on the victim's maroon and tan Chevrolet van "blew out." The victim drove to the side of the highway, parked the van, and the two men got out to change the tire. However, when they got the jack out of the van, they discovered they did not have a lug wrench they needed. The men sat on the side of the highway for approximately thirty-five minutes before another car stopped. Inside the car were Chris Hammack, Carrie Battles, and the appellant. After inquiring if the men needed help, Hammack, Battles, and the appellant got out of the car. Heath had never met the appellant before that day. When the appellant got out of the car, Heath noticed that he was wearing blue jeans but was not wearing a shirt. Heath said that the appellant acted "like he might have been up for a few days. Like he was drugged up."

Hammack offered to look in his trunk and see if he had a lug wrench they could use. He and Battles looked in the trunk and discovered that they did not have the wrench. Therefore, Hammack offered to drive the victim and Heath to Self's Market, which was approximately a mile and a half away, to borrow one. Heath agreed and offered to give them three dollars for the ride. The victim decided to stay and watch the van, and the appellant said that he would stay with the victim to keep him company.

Heath said that he, Hammack, and Battles went to the market. After borrowing a lug wrench and getting gasoline, they returned to the van. They were gone for approximately twenty minutes. When they returned, Heath did not see the victim. The appellant was approximately thirty-five

yards from the van, walking in a circle, looking at the ground, and sweating profusely. Heath acknowledged that the day was hot, but he stated that he was not sweating as much as the appellant. He said that the appellant did not look happy but that he did not see any blood on the appellant.

Heath asked the appellant about the victim, and the appellant said that the victim had flagged down a white car and "headed toward Waynesboro." The appellant said that the victim left instructions for Heath to wait at the van until he returned. Heath said that while he worked on the tire, Hammack and Battles talked to him and tried to help. The appellant remained about fifteen feet away. They had been back for approximately twenty-five to thirty minutes when a Lawrence County Sheriff's Department patrol car drove by. Upon seeing the patrol car, the appellant told Hammack and Battles, "We need to go. I want to get out of here." At that point, Hammack, Battles, and the appellant left.

Heath said that he changed the tire and continued to wait for the victim. After approximately thirty minutes, he drove to the market to return the wrench before the store closed. He then returned to the scene and waited for the victim. Around 8:30 or 9:00 p.m., he called the victim's girlfriend, Doris Patterson, to see if the victim had returned home. Following his conversation with Patterson, Heath went home. The victim had not returned.

The following morning, Heath, Cody, and the victim's son, Anthony, went to the scene on Highway 64 where the victim was last seen. The three brothers walked in different directions, looking for the victim. While Heath searched near the median, Cody walked along the side of the road where the van had been parked. Heath said that near the area where Cody was walking was a barbed wire fence. Across the fence was a small group of trees and a brush pile. Heath said "[t]here was another fence just before the brush pile and it was pretty much an empty field. It had tall grass." Cody followed a path "through the grass where someone had traveled toward the fence." Just across the fence, Cody found a blue hat that was identical to the victim's hat. Cody continued looking and found the victim's body in the brush pile. Heath testified that the victim was "cool to the touch," his body was stiff, and his wallet appeared to be missing. Heath waited with his father's body while Anthony and Cody left to call 911.

Carrie Battles testified that in June 2006, she was living with Hammack in Waynesboro. Around 10:00 a.m. on the morning of June 9, the appellant came to their home. Later, the three left the house to drive to a recycling center where they planned to sell some cans. Hammack was driving, the appellant was in the passenger seat, and Battles was in the back seat. Battles said that the appellant was acting "messed up." She explained that the appellant was drowsy, his head was down, and he said very little. Battles said that the appellant had been that way all day.

Battles said that as they were driving to the recycling center, they passed Heath and the victim who were on the side of the road. Hammack and Battles knew Heath, so they stopped to help. Hammack did not have a wrench, so he, Battles, and Heath drove to Self's Market. The appellant stayed with the victim. When they returned, the appellant was in the "middle of the four lanes." Battles said that the appellant "was drenched in sweat, like he just got out of the shower," and he was "[p]anting for air." Battles did not see the victim. She heard the appellant tell Heath that the victim had "flagged a white car down and was going back toward Waynesboro." Shortly afterward, the appellant walked to the car, grabbed a blanket from the back seat, and used it to wipe himself "from the chin, all the way down." Battles identified the blanket at trial.

Battles said that while they were trying to get the tire off of the car, they realized that a lug nut had been stripped and that they could not get the tire off. Battles, Hammack and the appellant returned home. Battles said that as they approached Hammack's residence, they saw the cover on the window move. The appellant asked Hammack if his father was there, and Hammack replied that he was. The appellant asked, "[W]ill he call the law?" Hammack said yes, and the appellant told Hammack to take him to Adrianne Rich's residence. Battles explained that Hammack's father lived close by and that he had on previous occasions "called the law" when there were a lot of people at Hammack's residence.

Battles said that the following morning, Heath, Cody, and Anthony came to her home. They asked if she had seen or heard from the victim. Battles told the men that she had not seen him. That night, officers from the Lawrence County Sheriff's Department came to Hammack's residence. Battles and Hammack were transported to the Lawrence County Jail where they were interviewed. As they were being driven home, Battles remembered that the appellant had used the blanket to wipe himself. Battles

told the officers about the blanket, and they took it from her car. Battles acknowledged that she never noticed any blood on the appellant.

Chris Hammack testified that on the morning of the offense, the appellant came to the home he shared with Battles. Hammack said that the appellant "did not seem like hisself that day" and that he acted as if he were on drugs. Hammack said that he and the appellant discussed money and that they "were both about broke." Hammack said that he, Battles, and the appellant got into the car to drive to Lawrenceburg. After they got into Lawrence County, they saw a van with a flat tire on the side of the road. When he recognized Heath, Hammack stopped to help. Hammack did not have a tool they needed to change the tire, so he offered to drive to Self's Market to get one. Battles and Heath went to the market with Hammack.

Cody Strickland testified that on June 9, 2006, he was living at the Tennessee Children's Home in Spring Hill. Cody had a weekend pass, and the victim was scheduled to drive him home to Waynesboro. However, the victim never came. On June 10, Laranda Morrow, Anthony's fiancee, picked him up around 5:30 a.m. and drove him home. Later that day, he and his brothers went to the scene and searched for the victim. Cody said that he saw a blue hat between a fence and a brush pile. He walked to the brush pile and saw a person in the brush pile he recognized as the victim. Cody "touched his leg to see if he was still alive and he wasn't." He also touched the victim's back pocket to see if his wallet was still there, but the pocket was empty. Nearby, he saw a cigarette lighter and noticed hair in the fence. He walked back and told his brothers that he had found the victim.

Detective Donnie Ferguson testified that he was called to the scene on the afternoon of June 10, 2006, after the victim's body was found. He stated that there were two fences between the road and the victim's body. He explained that the first fence was "up a little bank[,] a little rise with a right of way on the highway." He stated:

> From the first fence back to the second fence, it's more or less pasture. Flat. The grass was a little over knee high. Maybe a little taller than that. From here—from the second fence over to the brush pile, though, they had bushhogged it some time or another, but the grass was up.

Nearby was a limb that had blood on the end of it; Detective Ferguson opined that the limb was the murder weapon. Police found hair on the bottom string of the barbed wire fence closest to the brush pile and also found blood under the fence. Additionally, police found the victim's blue cap, a Bic lighter, and an unlit cigar identical to the ones in the victim's van. The next morning, police retrieved a blanket the appellant had used.

Detective Ferguson said that the victim's body was found lying face down behind some logs that were at the front of the brush pile. Detective Ferguson stated that the victim's body had "some vegetation over the head and chest area." He said, "You could see what looked like blood, multiple—could not recognize the body is what it amounted to. . . . We rolled him over and still could not recognize him. It looked like he had been beat several times in the head." Detective Ferguson stated that no personal property was found on the victim. The police were never able to recover the victim's wallet.

Detective Ferguson said that he believed the victim was hit first at or near the barbed wire fence and that he was killed behind the logs in the brush pile. He stated that with the victim's injuries, he expected to find a large pool of blood. Detective Ferguson found around the victim an area of blood that was "a little over a foot wide. It looked like it had soaked in the ground where his face was laying." Detective Ferguson acknowledged that nothing was found at the scene that was connected to the appellant.

Chief Medical Examiner Bruce Levy's autopsy report stated that the victim's death was a result of blunt force head injuries. The victim had multiple superficial injuries to his face and scalp. Two lacerations to the scalp measured greater than four inches. On the right side of the victim's forehead was a three inch by two inch "blunt force complex," within which were three lacerations measuring between one and a quarter inch to half an inch. Dr. Levy also noted contusions and edema around the victim's eyes, subgaleal and subdural hemorrhage, and fractures to the nasal cartilage and bone. The victim also suffered abrasions to the abdomen, left arm, both hands, and both legs. The autopsy revealed that a minimum of six blows were inflicted on the victim, which were consistent with being struck by a limb or some other cylindrical object.

Shana Mills, a forensic scientist with Bode Technology (Bode) in Martin, Virginia, testified that she was a serologist who tested items for

bodily fluids. In the instant case, she received from the Tennessee Bureau of Investigation (TBI) items of evidence to test for blood. The items included hairs from a possible suspect, hairs from a possible victim, blood from under a fence, a blanket, blue jeans, a tree limb, and a blood sample from a suspect. She found two potential spots of blood on the blanket. Mills then submitted the evidence to Sarah Shields, another Bode employee, for DNA analysis. Thereafter, the evidence was sent to the TBI crime laboratory. TBI forensic scientist Mike Turbeville testified that testing revealed that the victim's DNA profile matched the DNA profile generated by Bode from the evidence submitted, namely hair, blood found under a fence, a blanket, and a tree limb.

Lawrence County Sheriff's Deputy Brian Thomason testified that as he drove to work on June 9, 2006, he saw a maroon and tan van on the side of Highway 64. Late the next day, Deputy Thomason was sent to Brent Olive's residence to arrest the appellant. Upon Deputy Thomason's arrival at the residence, he saw two people, one of whom was the appellant, in the backyard. When the appellant saw the officers, he "took off" running. The appellant ignored Deputy Thomason's repeated instructions to stop. He ran seventy-five to one hundred yards and crossed the creek where he was apprehended by other officers. Deputy Thomason said he did not see the appellant throw anything as he ran, but he explained that it was dark.

Lawrence County Sheriff's Deputy Willie Norwood testified that he was with the team that arrested the appellant at a residence on Hurricane Creek in Wayne County. He saw the appellant run across the creek before being apprehended. He did not see the appellant drop anything, but he explained that it was dark.

Maury County Sheriff's Deputy Sherry Johnson testified that she booked the appellant into jail on the morning of July [sic] 11, 2006. The appellant insisted that he needed to use the telephone, "saying he had to get in touch with his son." Between 7:00 and 10:30 a.m., the appellant made several telephone calls, none of which were to his son. As was standard procedure, the calls were recorded. After hearing the appellant's side of the conversations, Deputy Johnson contacted the Lawrence County Sheriff's Department to see if the telephone calls would be useful to the investigation.

Richie Hickman testified that he made a copy of telephone calls the appellant made while he was in jail. A recording of the telephone calls was played for the jury. In the conversation, the appellant asked Kelly Jones to find a cloth "little white bag" he threw in the weeds "when [he] took off running from them at the creek." He told Kelly Jones that the bag was "full of pills and full of cocaine and old coins and everything."

Detective Ferguson testified that after he heard the recordings of the appellant's conversations, he and Investigator Charlie Carlton went to the creek where the appellant was arrested. However, they were unable to find the bag described by the appellant.

The appellant testified that he had prior convictions of forgery, theft, evading arrest, and being an habitual motor vehicle offender. He recalled that on June 9, 2006, he, Hammack, and Battles were going to a pawn shop in Lawrenceburg when they saw Heath and the victim parked on the side of the road with car trouble. The appellant said that because Hammack and Battles knew the men, they stopped to help. They learned that Heath and the victim could not change the van's flat tire because they did not have the right lug wrench. The appellant stayed with the victim while Heath, Battles, and Hammack went to Self's Market to borrow a wrench. The appellant said he tried to help the victim change the tire, but the wrench the victim was using slipped and "smashed" his hand. Eventually, they quit trying to change the tire. A white car pulled over, but the appellant could not tell who was inside. The victim got into the car. He told the appellant to tell Heath that he was going to Waynesboro. The appellant said that the car went toward Lawrenceburg and that was the last time he saw the victim. He said that Heath, Battles, and Hammack's trip to the market took about twenty minutes. He explained that he was sweating and panting when they returned because he had been "jogging up and down the road ... [for no] particular reason." He acknowledged that it was "very hot" that day, approximately ninety-five degrees. He said that he wiped off with the blanket.

The appellant denied that he killed the victim. He acknowledged that he and Hammack talked about being "broke." He said that Hammack was "broke" but that the appellant had twenty or thirty dollars. The appellant explained that he told Kelly Jones to get the bag he had thrown beside the creek because he had put cocaine and pills in it. He denied

-8-

telling her to get the bag because of the old coins. He said that he got the old coins from a friend's house, not from the victim.

*Id*., at *1-2.

### Post-conviction hearing

Petitioner testified that he was represented by a member of the public defender's office at trial. He said that at the time of his arrest on June 10, 2006, he was at Brent Olive's house. Mr. Olive was a longtime friend of Petitioner. Petitioner testified that shortly before his arrest, he told Mr. Olive that he had been to John Haggard's house and got some coins. Petitioner said:

I went there and I got some little drugs and some coins and stuff and I showed Brent Olive some coins that I had that it was a set of 1971 coins from a nickel, dime, quarter, half a dollar to a silver dollar.

Petitioner testified that Adrian Rich was with him when he got the coins from John Haggard's house. He said that he and Mr. Rich entered Mr. Haggard's house using a key located above the door. In addition to the coins, Petitioner testified that he took cocaine, pills (Xanax and Lortab), and marijuana from the house. Petitioner indicated that he and Mr. Haggard were good friends, and they grew marijuana together.

Petitioner testified that the coins belonged to him. He said:

They was mine. They was - [Mr. Haggard] was supposed to - he had got me a set of 1995 before, and I was wanting - that was the year my son was born. I was wanting a set of 1971, the year that I was born. And when I looked to get the weed, to get my half of the weed and stuff, I seen them coins in there, so I got the coins. I just took the coins.

Petitioner testified that he had the coins and drugs in a drawstring bag. He admitted at trial that he threw the bag into the weeds when he ran from police.

Petitioner admitted there was testimony at trial by one of the victim's sons that the victim had a couple of two-dollar bills, papers, and some old coins in his wallet at the time of the murder. He also admitted that during a phone call with Kelley Jones that was played at trial, he mentioned something about old coins in the bag with the drugs. Petitioner testified that he told trial counsel about the coins and that Mr. Haggard, Mr. Rich, and Mr. Olive could testify about the coins. Concerning Mr. Haggard, Petitioner testified: "Well, I

told [trial counsel], I said, that he could subpoena him to verify that I got the stuff out of the - out of that box. He'd have to tell the truth if he was under oath." He did not know if trial counsel spoke with Mr. Haggard.

Petitioner testified that when he asked trial counsel why Mr. Haggard was not present at trial, counsel indicated that the "bag was never found, so he didn't think that it was a [sic] issue to bring up." Petitioner testified that he needed Mr. Haggard to testify to show that the coins Petitioner had were laminated and surrounded with cardboard, and the two coins in the victim's wallet were loose. Petitioner admitted that the victim's wallet was never found. He testified that he threw the drawstring bag when he ran from police because it had drugs inside. Petitioner testified that he told the jury at trial that the coins belonged to him and not the victim. He felt that testimony by Mr. Haggard, Mr. Rich, and Mr. Olive would have supported his testimony.

Trial counsel testified that he and Petitioner had a discussion about possible witnesses to call at trial. However concerning Mr. Haggard, Mr. Rich, and Mr. Olive, trial counsel said that it was "never those people to come testify that the coins were not the deceased's coins." When asked if he would have ever considered calling the three witnesses to testify that the coins were not taken from the victim, trial counsel testified:

> Probably - of course, hypothetical type questions, but probably not, due to - - I know at one time that I had checked criminal records as best our office had the ability had to do on quite a few of the people, and most of them had [sic]. Now, exactly what their criminal records, if any, were, I don't know. But as far as the coins would go, I would - my strategy would have been not to even emphasize the presence of the coins because this alleged bag, alleged bag, was never found. No coins were ever found. It was basically some comments made pursuant to a telephone call from the Maury County Jail that the coins were even existing.

On cross-examination, trial counsel testified that one of the victim's sons, Heath Strickland, testified that the victim's wallet contained "some old coins" among other items. The victim's wallet and its contents were never found. Trial counsel also acknowledged that in a telephone conversation that Defendant had at the jail with Ms. Jones, Defendant asked Ms. Jones to try to recover a bag that had some old coins in it. The bag and coins were never recovered. Trial counsel did not recall having a conversation with Petitioner about how many coins were in the bag or what they looked like.

Trial counsel testified that he did not recall discussing John Haggard with Petitioner as a possible witness. However, he was "well aware" of Adrian Rich. Trial counsel knew

what Mr. Rich would say from discovery and discussions with Defendant. He did not recall discussing Brent Olive with Petitioner. Trial counsel did not recall if he told Petitioner that testimony about the coins was not relevant because they were never found.

After closing argument at the post-conviction hearing, the trial court asked post-conviction counsel if he had talked to John Haggard, Adrian Rich, and Brent Olive. Post-conviction counsel indicated that he had spoken with Mr. Rich and Mr. Olive, and he spoke to Mr. Haggard's attorney. When asked by the trial court if the witnesses should have testified at the post-conviction hearing, post-conviction counsel stated: "Judge the way that I'm going to answer that on the record is that I did speak to them and I decided that their testimony, whether it was not - whatever the reason, it was not going to be helpful."

*Analysis*

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. *See* T.C.A. § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001). As a mixed question of law and fact, this court's review of a petitioner's ineffective assistance of counsel claim is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011).

To establish entitlement to post-conviction relief via a claim of ineffective assistance of counsel, the post-conviction petitioner must affirmatively establish first that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases[,]" *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and second that his counsel's deficient performance "actually had an adverse effect on the defense[,]" *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In other words, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id*. at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996).

When reviewing a claim of ineffective assistance of counsel, we will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of

the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Regarding Petitioner's claim that trial counsel failed to call the three witnesses, the post-conviction court found that Petitioner failed to carry his burden at the evidentiary hearing of proving that counsel's performance was deficient or that any alleged deficient performance resulted in prejudice to Petitioner. The record supports the post-conviction court's ruling. Petitioner has not shown how any additional investigation on the part of counsel would have benefitted his case, and he did not present the testimony of any witness at the evidentiary hearing whom he claimed would have supported his claims. In fact, post-conviction counsel admitted that he did not call the witnesses to testify at the post-conviction hearing because he had decided that their testimony would not be helpful. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Petitioner is not entitled to relief on this issue.

In conclusion, Petitioner has failed to show that counsel's performance was deficient or that he was prejudiced by any alleged deficiencies. Accordingly, the judgment of the post-conviction court is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

-12-